**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

HEALTHCARE FACILITY MANAGEMENT LLC,
d/b/a CommuniCare Family of Companies,                    Case No. 1:23-cv-236

                              Plaintiff,                    Barrett, J.
              v.                                           Bowman, M.J.

JEDKREISKY MALABANAN,

                              Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff has filed a motion to dismiss Defendant's counterclaims in this case, which motion has been referred to the undersigned for initial consideration. (Doc. 7). With the exception of Defendant's claim for unjust enrichment, Plaintiff's motion should be DENIED.

**I.      Background**

Plaintiff Healthcare Facility Management LLC, doing business as CommuniCare Family of Companies ("CommuniCare") filed a complaint against Jedkreisky Malabanan in the Hamilton County Court of Common Pleas, seeking monetary damages in excess of $50,000.00 plus punitive damages, attorney fees, costs and interest, for breach of contract, unjust enrichment, and fraud. (Doc. 2). CommuniCare alleges that on March 11, 2021, CommuniCare and Malabanan "entered into a valid and enforceable contract for Defendant to provide certain services as a Registered Nurse at assisted living facilities owned and operated by CommuniCare (the "Contract")." (Doc. 2, ¶5). Under that contract, CommuniCare "agreed to pay Defendant an hourly wage in addition to advancing payment of all costs related to the relocation of Defendant [from the Republic

of Philippines] to the United States." (*Id.*, ¶6). CommuniCare further alleges that it advanced "in excess of $50,000" for Malabanan's relocation costs, and that Malabanan was contractually obligated to work for CommuniCare "for three (3) years to repay the Relocation Costs." (*Id.*, ¶ 8).

CommuniCare attached to its complaint a copy of the 2021 Letter Contract, setting forth a "conditional offer of employment with the CommuniCare Family of Companies" at the base rate of pay of $27.50 per hour. (Doc. 2, PageID 38). A provision of the same contract states that the offer is contingent, "[a]s with all prospective CommuniCare employees" upon Malabanan obtaining an appropriate visa, a license to practice in Ohio, and background checks. (*Id.*, ¶4, PageID 39).

Paragraphs 3, 7, and 8 refer to payments that CommuniCare will make on behalf of Malabanan. In ¶3, captioned "Other Remuneration," CommuniCare offers to purchase airfare to the employer's location, and to provide "an equivalent cash allowance of $1,000." (*Id.*, ¶3, PageID 39). In ¶7, captioned "Customary Expenses for Visa Processing and Arrival at Your Facility of Placement," CommuniCare states that "CommuniCare, through its Recruitment Agent World Wide HealthStaff Solutions Ltd, will advance the cost of your National Visa Center Bill when it is payable and reimbursement of the cost of your Visa Screen Certificate upon your commencement of employment with CommuniCare," (*Id.*, ¶ 7, PageID 40). In ¶ 8, captioned "The Expenses that CommuniCare May Advance," the Letter Contract reads:

> CommuniCare intends to make advance payments in the amount of approximately $16,000.00 USD on your behalf for expenses related to immigration, including certain filing fees, recruitment/agency fees, legal costs and temporary housing. These amounts exclude any labor certification costs mandated to be paid for by the employer/sponsor as such costs will be borne exclusively by CommuniCare. These

2

> expenditures may include items discussed in paragraph 7 above. Upon your request, CommuniCare will provide you with a detailed listing of the expenses incurred on your behalf that are subject to the repayment agreement. Such expenses are considered advancements eligible to be forgiven over a period of employment as outlined below.

(*Id.*, ¶8, PageID 40).

After identifying the prepaid expenses in ¶¶ 3, 7 & 8, the Letter Contract explains that those same "advancements" provide the basis for damages that are due if the employee fails to remain with CommuniCare for three years:

> **9. How You Repay Us.**
>
> As described above, in the paragraph numbers 3, 7 & 8, certain costs incurred by CommuniCare on your behalf are considered advancements and relocation assistance eligible to be forgiven over a period of continued employment subject to certain conditions. You do not have to pay back the advance if you remain an employee of CommuniCare, comply with all CommuniCare policies, and meet work performance expectations for a period of thirty-six (36) months after the commencement of employment as a R.N. These advancements and relocation assistance will be forgiven over a period of thirty-six (36) months, at a rate of 1/36th for each month's service at CommuniCare. Federal, state and local taxing authorities may consider the forgiveness of these advancements and relocation assistance to be income subject to taxation.
>
> CommuniCare will act in accordance with those taxing authorities and apply any taxes required by the authorities. By accepting employment with CommuniCare, you agree to repay CommuniCare the initial incentive payment together with any balance of the advances and relocation assistance should you voluntarily terminate your employment at CommuniCare or should CommuniCare terminate your employment for any reason other than a layoff or facility closure during the thirty-six (36) month period. If you fail to repay at the time of termination, CommuniCare may pursue restitution through legal channels. You also agree that CommuniCare shall have the right to withhold, offset or retain amounts which may otherwise be due to you as salary, wages or other wise to satisfy any amount due to CommuniCare by you.

(*Id.*, ¶ 9, PageID 40-41). The letter concludes with instructions that "to accept this offer" the prospective employee must sign, date, and return it to "CommuniCare's

representative, WorldWide HealthStaff Solutions." (*Id*. at PageID 41). Malabanan executed the referenced Letter Contract on March 11, 2021.

CommuniCare alleges that Malabanan began to work "at a [CommuniCare] medical facility at $27.50 an hour" on or around August 3, 2022, but "abruptly quit or resigned" less than a year later, on or about January 29, 2023. (*Id*., ¶¶10, 12, PageID 33). CommuniCare's state court complaint alleges that Relocation Costs in excess of $50,000 were "due and owing upon [his] resignation,"[1] but that Malabanan failed to remit repayment. (*Id*., ¶¶ 7-9, 13-16).

On April 27, 2023, Malabanan filed a Notice of Removal in this Court. On May 3, 2023, Malabanan filed an answer, and on May 23, 2023, he amended that answer to assert a dozen counterclaims against CommuniCare. (Docs. 6, 11). Attached to Malabanan's pleading is a copy of a second Letter Contract, dated August 1, 2022. The 2022 Letter Contract appears to be nearly identical to the 2021 Letter Contract, including the repayment provision, except that Defendant's rate of pay is stated as $36.00 per hour. (Doc. 11-1, PageID 137).[2]

On June 13, 2023, CommuniCare filed a motion to dismiss all counterclaims for failure to state a claim under Rule 12(b)(6).

## II.     Analysis

### A.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a challenged pleading "must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 66, 678 (2009) (quoting *Bell Atl. Corp.*

---

[1] Throughout the complaint, CommuniCare refers to Defendant by feminine pronouns.
[2] Despite the second Letter Contract bearing the date of August 1, 2022, Defendant's signature is dated July 1, 2022. (Doc. 11-1, PageID 140).

*v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007)). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). A complaint need not contain "detailed factual allegations," but must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

In considering whether Malabanan's counterclaims meet the requisite standard to survive CommuniCare's motion to dismiss, the Court must construe the counterclaims in the light most favorable to Malabanan "and accept all allegations as true." *Keys v. Humana, Inc.*, 882. F.3d 579, 588 (6th Cir. 2018). In other words, the court must draw all reasonable inferences in favor of the non-moving party. *See Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007). "The Supreme Court took pains to stress in both *Twombly* and *Iqbal* that what is required at the pleading stage is a plausible, not probable, entitlement to relief." *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012)

### B. A Preliminary Procedural Issue Concerning CommuniCare's Exhibits

A court's review under Rule 12(b)(6) is narrow. Generally, the court is limited to review of the challenged pleading and any exhibits attached thereto, although the court may also take judicial notice of public records. Here, CommuniCare asks the Court to consider six evidentiary exhibits attached to its motion to dismiss. In its discretion, a

5

court "may consider" exhibits attached to a motion to dismiss, but only if the documents are "referred to in the [pleading] and are central to its claims." *See Bassett v. Nat'l. Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008*); Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001). Defendant objects to consideration of CommuniCare's extrinsic evidence.

The undersigned concludes that four of the exhibits should not be considered under Rule 12(b)(6). Alternatively, because the consideration of extrinsic evidence under Rule 12(b)(6) remains discretionary even if permissible, the undersigned recommends that the Court exercise its discretion to exclude four exhibits. Only documents that are "referred to" in Defendant's counterclaims may be considered under Rule 12(b)(6). *See, e.g., Decoration Design Solutions, Inc. v. Amcor Rigid Plastics USA, Inc.*, 553 F.Supp.3d 424, 427 (E.D. Mich. 2021) (excluding documents because "not referred to in the complaint, despite being central" to claims presented); *Spartan Chemical Co., Inc. v. National Chemical Laboratories of PA, Inc.*, 2018 WL 6169378, at *2 (N.D. Ohio 2018) (permitting consideration of email both referenced in complaint and central to claims, but excluding receipts and invoices not specifically referenced in pleading). And even if specifically referenced in the pleading, the party proffering the extrinsic evidence must show that the documents are "central to" the non-moving party's claims (Defendant here). *See Amini v. Oberlin Coll.*, 259 F.3d at 502 (EEOC charge referenced in the complaint was central to claim of employment discrimination); *but contrast, e.g., In re FirstEnergy Corp. Securities Litigation*, 316 F.Supp.2d 581, 591-92 and n.4 (N.D. Ohio 2004) (exhibits excluded because defendant failed to demonstrate how plaintiff relied on the proffered exhibits, which were not explicitly referenced in the

complaint); *MCRS, Inc. v. Etue*, No. 11-14590, 2012 WL 666836, at *2 (E.D. Mich. Feb. 29, 2012); *Board of Trustees of City of Birmingham Employees' Retirement System v. Comerica Bank*, No. 09-cv-13201, 2011 WL 13214388, at *2 (E.D. Mich. Dec. 16, 2011).

### 1.  The Two Properly Considered Exhibits

Only two exhibits offered by CommuniCare are properly considered. The most obvious is CommuniCare's offering of the same August 1, 2022 Letter Contract attached to the counterclaims. (*Compare* Doc. 13-2 with Doc. 11-1). That exhibit would be appropriate for the court to consider even if Defendant himself had not offered it, because it is repeatedly referenced in and central to Malabanan's claims.

The court also may consider a paystub that reflects Malabanan's pay for his last week of work in January, so long as there are no specific challenges to its authenticity.[3] The issue of whether the repayment provision would reduce Malabanan's final pay below the minimum wage threshold is a central issue to Malabanan's declaratory judgment claim under the Fair Labor Standards Act ("FLSA"), and Malabanan refers to the same pay stub in his pleading. (Doc. 11, ¶ 213; *see also id.*, ¶¶ 160, 214-215, 230-231, 330-332, 334).

### 2.  The Four Excluded Exhibits

CommuniCare's remaining four exhibits fail to satisfy the requisite standard for consideration under Rule 12(b)(6).

---

[3]In its reply, CommuniCare asserts that Malabanan "did not dispute" the authenticity of any of its exhibits. (Doc. 15, PageID  450). To the contrary, Malabanan specifically calls out the fact that the exhibits as a whole are "unauthenticated documents." (Doc. 14, PageID 435). *See also Doe v. Bollaert*, 2014 WL 972000, at *2 (S.D. Ohio March 12, 2014) (declining to consider unauthenticated additional material in the context of a motion to dismiss).

### The WorldWide HealthStaff Recruiting Agreement

CommuniCare offers a copy of a Recruiting Agreement between WorldWide HealthStaff Solutions Ltd. ("WorldWide") and MD OMG EMP, LLC ("Recruiting Agreement") in part to support its contention that Malabanan's Trafficking Victims Prosecution Act ("TVPA") claim fails. (*See*, *e.g.*, Doc. 13, PageID 389). CommuniCare also cites to the Recruiting Agreement to support dismissal of Malabanan's RICO claim. (*Id.*, PageID 392). But the Recruiting Agreement is neither explicitly referenced in Malabanan's Counterclaims nor central to those claims. Therefore, it is excluded from consideration under Rule 12(b)(6).

### Orientation Acknowledgment

CommuniCare also cites to "Brookside's Orientation Acknowledgement Form" that it alleges that Malabanan executed when he began working at Brookside Healthcare Center in Cincinnati, Ohio ("Brookside"). CommuniCare offers the Orientation Form to support its contention that Brookside (and not CommuniCare) was Malabanan's "actual employer" under the FLSA. (Doc. 13, PageID 385). CommuniCare also cites to the Orientation Form as evidence that it did not breach its contract because Brookside "provided Malabanan an employee orientation during the first week of employment." (Doc. 13, PageID 394). Again, there is no reference to the Orientation Acknowledgement Form in Malabanan's counterclaims.[4] Therefore, it will not be considered.

---

[4]The exhibit in question bears Defendant's name in a field marked "Employee Name" at the top of the form, but gives no indication whether it is a "Brookside" form or a "CommuniCare" form. A field for "Date of Orientation" is left blank, and the form is neither signed nor dated at the bottom. (Doc. 13-3, PageID 412).

8

### Miscellaneous Policies and Procedures

CommuniCare offers a disjointed collection of pages that it represents to be some of "*Brookside's* Policies and Procedures," [5] in order to refute CommuniCare's claims that the "employee compensation policies" and "workplace policies" were illegal and resulted in him being "trapped" by his employer. (Doc. 13-4, PageID 413-427). CommuniCare refers to the same collection of documents to support its contention that Brookside and not CommuniCare was Malabanan's "employer" under the FLSA.

None of the pages are explicitly referenced in any of Malabanan's Counterclaims. Nevertheless, CommuniCare argues that all tendered Policies and Procedures are "incorporated into" the Letter Contract because the contract bases its conditional offer of employment on Malabanan's general agreement "to abide by *CommuniCare* policies and procedures," (Doc. 11-1, PageID 138 (emphasis added)). But a cursory reference to a document in a pleading, which does not identify the contents of the document, is not sufficient for the court to find incorporation by reference. *See In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455, 467-68 (6th Cir. 2014); *Parker Hannifin Corp. v. Standard Motor Products, Inc.*, No. 1:19-cv-617, 2019 WL 5425242, at *15 (N.D. Ohio Oct. 23, 2019) (excluding exhibits that were not attached to complaint or expressly referred to in that pleading).

### Confirmation of Malabanan's Nursing License

Exhibit 5 to CommuniCare's motion is captioned as a "QuickConfirm License Verification Report" dated June 13, 2023. (Doc. 13, PageID 429-430). CommuniCare

---

[5]Despite CommuniCare's characterization, the pages appear to have been generated by "CommuniCare Health Services." (*See* Doc. 13-4, PageID 415). One page, termed a "Voluntary Resignation Procedure," refers to an entity identified only as "CHS." (*Id.*, PageID 425) The sole reference to "Brookside" appears to be the designation of "Brookside" as the "Facility/Location" to which Defendant is to be assigned by CommuniCare. (*Id.*, PageID 413).

identifies the document as confirmation by Nursys[6] that Malabanan was licensed as an RN in Ohio as of March 17, 2022, a year after he signed the 2021 Letter Contract. CommuniCare argues that the document relates to Malabanan's "allegations and claims relying on his status as a registered nurse." (Doc. 15, PageID 450). But Malabanan does not deny that he became licensed in Ohio and relevance is not the salient issue. Because the document is not explicitly referred to by Malabanan in the Counterclaims and is not central his underlying claims, it cannot be considered.

### C. The Substantive Analysis of CommuniCare's Arguments

Having resolved that only the 2022 Letter Contract and paystub may be considered under Rule 12(b)(6), the undersigned turns to CommuniCare's substantive arguments.

### 1. FLSA Claims

Malabanan accuses CommuniCare of multiple violations of the FLSA, such as failing to pay him for work performed during meal periods or off the clock. CommuniCare seeks dismissal on grounds that Brookside was Malabanan's sole "employer." The undersigned disagrees.

Under the FLSA, "Employer" means "any person acting directly or indirectly in the interest of an employer in relation to an employee…." 29 USCA §203(d). "The remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Ellington v. City of East Cleveland*, 689 F.3d 549, 554-55 (6th Cir. 2012) (additional internal quotation marks and citations omitted). Therefore, "more than one 'employer' can be simultaneously

---

[6]CommuniCare represents that Nursys is a nurse licensure and disciplinary database that participating boards of nursing designate as their primary source equivalent database. (Doc. 13, PageID 382).

responsible for FLSA obligations." *Fegley v. Higgins*, 19 F.3d 1126, 1131, (6th Cir. 1994) (holding that individual who had significant role in running businesses was jointly liable as an employer).

To support its position that only Brookside (and not CommuniCare) was Malabanan's true employer, CommuniCare cites to exhibits that it characterizes as "Brookside's policies and procedures, benefits awards, and paystub." (Doc. 13, PageID 385-386). For the reasons previously stated, only the paystub may be considered. And it does not identify Brookside as Malabanan's employer.[7]

Reasonably interpreting Malabanan's allegations and the express language of the 2022 Letter Contract, it is clear that Malabanan has plausibly alleged that CommuniCare was his employer. Malabanan has alleged both that he was an employee and that CommuniCare was an employer under the FLSA; a plausible inference is that CommuniCare was Malabanan's employer. Malabanan further alleges that he was sponsored for employment by CommuniCare under federal immigration law for purposes of his immigrant visa and that CommuniCare offered to employ him as a Registered Nurse at a rate of $27.50 per hour. (Doc. 11, ¶¶72-73). And both Letter Contracts consistently refer to CommuniCare as the employer and to Malabanan as its prospective employee.

While the 2022 Letter Contract refers to a higher hourly rate, both Letter Contracts state that Malabanan

> will be paid bi-weekly in accordance with the CommuniCare payroll practices and schedules. Healthcare Facility Management, LLC is an entity of Communicare family of companies.

---

[7]The document indicates Malabanan's name and Employee ID number, with the "Company" identified as "OHNH EMP LLC." (Doc. 13-6, PageID 431).

(*See*, *e.g.*, Doc. 11-1, PageID 137). The Letter Contracts refer to CommuniCare's "performance expectation" and ability to terminate Malabanan's employment. And CommuniCare itself represents in its motion to dismiss that it filed immigration forms that "certified that it 'will be able to place the alien on the payroll on or before the date of the Alien's proposed entrance into the United States' and the "job opportunity's terms, conditions, and occupational environment are not contrary to Federal, state or local law…." (Doc. 13, PageID 381).

In its reply memorandum CommuniCare (mis)characterizes Malabanan's allegations as referring only to Brookside. CommuniCare also misrepresents that the Letter Contract states that Malabanan was being "assigned to work at <u>and be employed by Brookside.</u>" (Doc. 15, PageID 452 (emphasis added)). It does not. The express language of the August 1, 2022 Letter Contract continually refers to CommuniCare as the employer and to Malabanan as its "prospective employee." [8]

### 2. TVPA Claims

In Count 2, Malabanan alleges that CommuniCare obtained forced labor through threats of serious harm and threatened abuse of legal process relating to the repayment provision. Malabanan alleges that he "was forced to enter into a letter-contract of employment containing the Repayment Provision on a take-it-or-leave-it basis and faced substantial harm if he did not sign the letter-contract, including potentially having his immigration sponsorship withdrawn or having his green card revoked, or having his employment rescinded, and any of such would be financially ruinous to him." (Doc. 11,

---

[8]There is but one reference in the Letter Contracts to Brookside. Bearing the caption "Facility Placement," ¶2 states: "You will be assigned to CommuniCare in Brookside Healthcare Center, Cincinnati, OH." (*Id*, PageID 138). A plausible interpretation is that, as *CommuniCare's employee*, Malabanan would be assigned to work at its employer-owned and operated facility.

¶339).

Under the Trafficking Victims Protection Act, 18 U.S.C. § 1589, *et seq*., a defendant is liable for "forced labor" when he "knowingly provides or obtains the labor or services of a person" by any of the following means:

> (1) by means of force, threats of force, physical restrain, or threats of physical restrain to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

*Id*., § 1589(a). A threat of "serious harm" under the TVPA includes "psychological, financial or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstance to perform or continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). Malabanan argues that CommuniCare's conduct included a threat of serious harm, abuse or threatened abuse of the legal process, and a scheme to make Malabanan believe that he would suffer serious harm, in violation of §§ 1589(a)(2), (a)(3), and (a)(4).

In addition to the violation of § 1589(a), Malabanan alleges in Count 3 that CommuniCare violated § 1589(b), which prohibits an entity from "knowingly benefit[ing]… from participation in a venture which has engaged in the providing or obtaining of labor…. by any of the means described in subsection (a)." In Count 4, Malabanan alleges a violation of § 1590(a), which imposes liability for "knowingly

13

recruit[ing]… any person for labor or services in violation of this chapter." 18 U.S.C. § 1590(a). And Count 5 alleges a violation of § 1594(a) of the TVPA, which extends liability to "whoever attempts to violate 1581, 1583, 1589, 1590, or 1591" of the TVPA. All of the TVPA violations, along with two declaratory judgment claims (Counts 9 and 11) rest on Malabanan's contention that the repayment provision and threats of legal process to enforce that provision amount to abuse of the legal process and/or "serious harm."

But CommuniCare argues that Malabanan's allegations are insufficient. "There are all sorts of financial pressures that can arise in the employment setting, and not all of them serve to establish a TVPA violation." *Dale Carmen v. Health Carousel, LLC*, (hereafter "*Health Carousel I*"), No. 1:20-cv-313-DRC, 2021 WL 2476882, at *6 (S.D. Ohio June 17, 2021). "[T[o constitute 'financial harm' under the TVPA, the threatened harm must be in some way improper or illicit." *Id*. CommuniCare maintains that the repayment clause, including the warning of the pursuit of "restitution through legal channels," was both proper and fully enforceable under Ohio law. (Doc. 13, PageID 386-87). Therefore, CommuniCare argues that it did not engage in any illicit conduct that violates the TVPA.

In *Health Carousel I*, however, this Court denied a Rule 12(b)(6) motion and permitted similar claims to proceed after concluding that the validity of the repayment provision could not be determined absent further development of the record. *Id*., 2021 WL 2476882, at *9 (explaining that under Ohio law, whether a sum is an unenforceable penalty or an enforceable liquidated damages provision depends on the operative facts and circumstances, for which discovery is necessary). *Health Carousel I* required the

14

Court to consider TVPA claims filed by Filipino nurses against a recruiting firm that would enlist foreign nurses to work in facilities in the United States. Sound familiar? Like CommuniCare, Health Carousel would sponsor the nurses' U.S. resident visa petitions, and pay immigration and relocation fees, along with airfare and related expenses. But the Employment Contract, which each nurse would typically sign in the Philippines to initiate the relationship, contained a 3-year "Commitment Period" along with a "Breach Obligation" provision that required the nurse to repay a list of expenses as "liquidated damages." *Id.*, 2021 WL 2476882, at *2. In a subsequent Addendum to the contract, the parties agreed to specific damage figures, depending on when the breach occurred. Thus, a nurse was required to pay $1,000 if the breach occurred before the employer filed for the visa, $10,000 if the breach occurred after it filed for the visa but before its issuance, and $20,000 if the breach occurred after the visa was issued but before the end of the "Commitment Period." *Id.*

In *Health Carousel I*, U.S. District Judge Douglas R. Cole held that the nurses had alleged sufficient facts (including but not limited to the liquidated damages clause)[9] "to plausibly show that a reasonable immigrant in [plaintiff's] position would feel a threat of 'serious harm' if she were to leave Health Carousel." *Id.*, 2021 WL 2476882, at *6. The court emphasized the limited scope of review under Rule 12(b)(6) and the necessity of contextual analysis, pointing out that the same term would not have the same impact when applied to a corporate CEO with a $10 million annual salary as it would upon a "foreign citizen recruited to a job opportunity in this country [who] may not

---

[9]The nurses in *Health Carousel I* alleged other illicit contractual terms, including provisions in the Employee Handbook to which they agreed upon their arrival.

have a deep (or any understanding of the legal system or their rights under their system." *Id.*, at \*7.

> [I]t is not the amount of liquidated damages, per se, that controls the analysis. Rather, what matters is whether the specified liquidated damages in a given case rise to the level of serious harm considering all of the surrounding circumstances - such as the enforceability of the term, or the employee's pay rate, or other aspects of the arrangement.

*Id.*

The court reasoned that "the key questions relate to the substantive terms of the alleged contract (e.g., are they too one-sided?), as well as the parties' conduct in the formation and performance of the agreement." *Id.* at \*8. Therefore, a TVPA claimant can show "serious harm" if he can show "sufficiently egregious" procedural or substantive shortcomings in the formation or enforcement of the contractual provision at issue. *Id.* Noting a critical issue was whether the $20,000 liquidated damages provision was valid under Ohio law, Judge Cole denied the motion to dismiss because "the answer to that question depends heavily on the facts surrounding a given contract." *Id.* at \*9.

Understandably, Malabanan relies heavily on *Health Carousel I*, which the undersigned finds to be highly persuasive. Of note, after briefing on the motion to dismiss in this case was concluded, Judge Cole expanded his analysis. *See Carmen v. Health Carousel, LLC*, ("*Health Carousel II*") No. 1:20-cv-313, 2023 WL 5104066, at \*1 (S.D. Ohio Aug. 9, 2023). Considering a Third Amended Complaint that added new claims and plaintiffs, the court reached the same conclusion.

> Plaintiffs Carmen, Amistoso, and Flores have plausibly alleged their TVPA claims. They provide sufficient allegations that Health Carousel created a threat of "serious harm" to compel their labor. Many of the same allegations from the Amended Complaint remain, including allegations that Health Carousel forced the Plaintiffs to work excessive overtime and that

Health Carousel used liquidated damages as a "penalty" to lock Plaintiffs
in.

*Health Carousel II*, 2023 WL 5104066, at *7 (denying defendant's motion to dismiss
plaintiffs' Third Amended Complaint and denying defendant's motion to strike plaintiffs'
class allegations and to stay discovery).

Rather than attempting to distinguish *Health Carousel*, CommuniCare turns to
other cases to argue that enforcement of its contract constitutes "the permissible 'use' of
the legal process" rather than an "'abuse' of the legal process." *See Estavilla v.
Goodman Grp, LLC*, No. 21-68-M-KLD, 2022 WL 539192 (D. Mont. Feb. 23, 2022)
(distinguishing *Health Carousel I* and granting defendants' motion to dismiss TVPA
claims after concluding that a $20,000 "liquidated damages" provision for the
advancement of immigration and relocation expenses was permissible). Having
examined the relevant case law, the undersigned finds *Health Carousel I and II* to be
well-reasoned and the more persuasive authority, considering Ohio law and the
procedural context of Rule 12(b)(6).

Consider that the Letter Contract at issue does not specify an *exact* dollar figure
for repayment as would be typical for an actually "liquidated" damage figure, but instead
sets forth a list of expenses that the parties agree "may" be used to determine the
repayment amount, including the cost of airfare, "an equivalent cash allowance of
$1,000," immigration expenses including the employee's "National Visa Center Bill" and
"Visa Screen Certificate" plus "advance payments … related to immigration." (*See* Doc.
11-1, ¶¶3, 7, 8). In its motion to dismiss, CommuniCare suggests that ¶8 makes the
contract enforceable because it *estimates* the stipulated damage amount by specifying
that CommuniCare *intends* to advance "*approximately* $16,000." (Doc. 13, PageID 388).

17

It argues further that "the amount of $16,000 was a reasonable prediction of the amount of potential damages." (*Id*., PageID 389).[10] Yet the repayment provision in ¶9 does not confine itself to the $16,000 estimate in ¶8, instead referring back to ¶¶ 3, 7, and 8 as advances that the employee could be required to repay. And in its complaint seeking payment from Malabanan, CommuniCare seeks to recover advancements totaling more than $50,000.[11] (Doc. 2, ¶¶ 7-9, 13-16). In the absence of any discovery regarding the surrounding circumstances (including whether Malabanan had fair notice of the precise sum that CommuniCare would seek to collect), the undersigned cannot determine whether the "repayment provision" would be treated as a proper "liquidated damages" provision under Ohio law or as an "unconscionable, unreasonable, and disproportionate" penalty. *Accord*, *Health Carousel I*, 2021 WL 2476882, at *9 (holding that discovery was required to resolve the same issue under Ohio law); *see also*, *generally*, *Paguirigan v. Prompt Nursing Employment Agency, LLC*, 286 F. Supp.3d 430, 438 (E.D.N.Y. 2017); *Lesnik v. Eisenmann* SE, 374 F. Supp.3d 923, 952 (N.D. Cal. 2019).

In addition to agreeing with Judge Cole's analysis of a similar fact pattern in the *Health Carousel* decisions, the undersigned finds other case law cited by CommuniCare to be distinguishable. For example, in *Physicians Anesthesia Serv. v. Burt,* No C-06071, 2007 WL 4463972 (Ohio Ct. App., 1st Dist., Dec. 21, 2007), an anesthesiology group ("PAS") provided a local nurse with a lump-sum student-support loan in the amount of $33,573.09 that would allow her to complete a Nurse Anesthetist Master's program at the University of Cincinnati in exchange for her agreement to work for three years. If she

---

[10]For this point, CommuniCare relies again on extrinsic evidence that is not properly considered.

[11]At best, the contractual language regarding the precise amount of stipulated damages, whether the "estimate" of $16,000 or some undefined total of the sum of ¶¶ 3, 7, and 8, is ambiguous.

completed the term, the loan would be paid off. If not, the remaining loan balance would become due and payable, along with a liquidated damages of 50% of the remaining loan balance with interest. When Burt left to take a new position in California, she dutifully paid the remaining loan balance of $11,191.03 and requested an accounting of the liquidated damages she owed. But after PAS failed to provide that accounting for seven months, Burt protested the tardiness of their response and contested the calculation of $5,595.52.

The Ohio court stressed the unique surrounding facts and circumstances before concluding that the liquidated damages provision was not unreasonable or unconscionable:

> Burt, an experienced nurse, had entered into and then breached a previous contract with a nearly identical liquidated-damage provision. PAS had assisted Burt in satisfying a 50%-of-the-principal-balance damages provision when she breached her contract with Anesthesia Group Practice, Inc. to join PAS.

*Id*., 2007-Ohio-6871, ¶ 18, 2007 WL 4463972, at *4. In contrast to *Burt*, Malabanan professes to be an inexperienced immigrant unfamiliar with the U.S. legal system, and it is not clear from the Letter Contract when (if ever) he was advised of the precise total of "advances" that he would be expected to repay.

In addition to being factually distinguishable, two additional Ohio cases cited by CommuniCare similarly emphasize the contextual analysis that is required to ascertain whether a stipulated damages clause is enforceable as "liquidated damages" or an unenforceable penalty. *See Lake Ridge Academy v. Carney*, 613 N.E.2d 183, 66 Ohio St.3d 376 (Ohio 1993) and *Samson Sales, Inc. v. Honeywell, Inc*., 12 Ohio St. 3d 27,

465 N.E.2d 392 (Ohio 1984).[12] In *Lake Ridge Academy*, the Ohio Supreme Court upheld liquidated damages in the amount of a year's worth of private school tuition after a lawyer-parent withdrew his son shortly before the school year started, but after the specified August 1 cancelation date. *Id*., 613 N.E.2d at 187. The court described the father's extensive experience with contract law and considered "the amount of the stipulated sum, not only as compared with the value of the subject of the contract, but in proportion to the probable consequences of the breach." *Id.*, 613 N.E.2d at 187-188.

In *Samson Sales, Inc*., a store owner - who had paid $1500 for installation of an alarm system and a monthly subscriber's fee of $150 for years - sought to recover as damages more than $68,000 for lost merchandise after the defendant failed to alert police about a burglary. The Ohio Supreme Court struck down a provision that stipulated damages at just $50, again focusing on the surrounding facts and circumstances. As the court put it, "[s]urely, Samson, which apparently had some business experience, did not pay $10,500 for the mere possibility of recouping $50 if Honeywell provided no service at all under the terms of the contract." *Id.*, 465 N.E.2d at 394.

In short, the Ohio case law cited by CommuniCare does not support the dismissal of Malabanan's claims under Rule 12(b)(6).

### 3. RICO Claims

To state a civil RICO claim, Malabanan must plead the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275 (1985). In addition,

---

[12]Neither case involved an employment contract. And both cases specified a sum certain as damages, rather than a list of "advances."

Malabanan must show "(1) two or more predicate racketeering offenses, (2) the existence of an enterprise affecting interstate commerce, (3) a connection between the racketeering offenses and the enterprise, and (4) injury by reason of the above." *Health Carousel II*, 2023 WL 5104066, at *9 (quoting *Grow Michigan, LLC v. LT Lender, LLC*, 50 F.4th 587, 594 (6th Cir. 2022)).

CommuniCare argues first that Malabanan's RICO claims should be dismissed based on the lack of an "enterprise" between CommuniCare and WorldWide.[13] CommuniCare argues that the only conduct that Malabanan alleges in the Counterclaims involves CommuniCare's own affairs, and not those of a separate enterprise. I disagree. Malabanan clearly alleges that CommuniCare and WorldWide acted in concert as a RICO "enterprise," and that alternatively, CommuniCare, WorldWide and CommuniCare's facility-clients such as Brookside constitute an enterprise. (Doc. 11, §§ 289-294). Drawing reasonable inferences in his favor, Malabanan alleges that CommuniCare (together with its healthcare facility-clients) and WorldWide acted with a common purpose of recruiting, providing, and processing inexpensive foreign-trained registered nurses to perform work in the United States. (*Id*., ¶¶290-291). CommuniCare also has plausibly alleged that the enterprise consistently engages in interstate commerce. (*Id*., ¶292). *See Health Carousel, LLC*, 2023 WL 5104066, at *9 (noting that Health Carousel appeared to be an enterprise operating in interstate commerce).

CommuniCare protests that Malabanan's accusations that CommuniCare engaged in fraud in carrying out its business does not mean that it was engaged in a

---

[13]CommuniCare relies in part on the Recruiting Agreement, but the undersigned declines to consider that extrinsic evidence under Rule 12(b)(6).

RICO enterprise. But Malabanan's allegations are sufficient here. According to Malabanan, Worldwide prepared immigration forms on CommuniCare's behalf, and "had a principal and significant role in terms of directing or deciding who among the nurse-applicants would …eventually be employed by CommuniCare." (Doc. 11, ¶168, *see also*, *generally* ¶¶166-177, 274, PageID 104-106, 119-120). In its capacity as CommuniCare's agent, Malabanan alleges that WorldWide "knew, came to know, or had to know" that CommuniCare did not intend to pay its nurses a prevailing wage and required repayment if the nurses failed to complete a 36-month term of employment. (*Id.*, ¶172). Malabanan further alleges that WorldWide "knew about" the visa misrepresentations by CommuniCare "and condoned the same." (*Id.*, ¶175). Thus, Malabanan plausibly alleges that WorldWide knew that CommuniCare was engaging in fraud. (*See generally*, *id.*, §§ 166-177, 276).

CommuniCare next argues that Malabanan has not alleged sufficient facts to establish a "pattern of racketeering." Malabanan accuses CommuniCare of visa fraud, wire fraud, foreign labor contract fraud, and forced labor and trafficking (the TVPA claims), all of which would constitute predicate acts. But Fed. R. Civ. P. 9(b) requires Malabanan to plead the fraud claims with particularity, which CommuniCare maintains he has not done. CommuniCare challenges whether Malabanan has sufficiently identified which statements were fraudulent, who made the statements, where and when the statement were made, or explained why the statements were fraudulent.

The undersigned concludes that Malabanan has sufficiently pled facts that would establish a pattern of racketeering. (*See*, *generally*, Doc. 11, §§ 144-158, 273-275, 280-282). Count 6 contains Malabanan's allegations of visa fraud, 18 U.S.C. § 1546; wire

fraud, 18 U.S.C. § 1343; and fraud in foreign labor contracting, 18 U.S.C. § 1351. There, Defendant specifically alleges that CommuniCare knowingly misrepresents on its Form I-140 immigrant worker petitions that its terms of employment comply with state law, when in fact the repayment provision is an illegal penalty. (Doc. 11, ¶268). He alleges that CommuniCare also knowingly misrepresents on the same forms that it is seeking workers for full-time permanent employment, even though it knows there are periods when its workers (including Malabanan) will be unassigned to any facility or "benched." (*Id*., ¶ 269). He accuses CommuniCare of misrepresenting on its immigration forms that it pays the "prevailing wage" when that is untrue given the repayment provision and practice of "benching" some workers without pay. (*Id*. ¶270; *see also* ¶100 (alleging that CommuniCare did not put Defendant on its payroll upon Malabanan's entry into the United States)).

In terms of wire fraud and fraud in foreign labor contracting, Malabanan alleges that CommuniCare failed to inform him of such non-payment periods, "instead communicating to him that he would be [a] full-time and permanent employee." (*Id*., ¶271). Malabanan alleges that the terms of employment, including the referenced misrepresentations, were electronically communicated to him on August 1, 2022 by CommuniCare's agent, Hailee Alberts, as well as to other nurses in the Philippines on specified dates between May and August 1, 2022. (*Id*., ¶275).

Judge Cole's analysis in *Health Carousel II* is again instructive:

[W]hile the Court applies the heightened fraud pleading standard of Rule 9(b) to these fraud predicates, *see Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017), Plaintiffs have met that standard here. They present the actual contractual terms containing the alleged misrepresentations. Indeed, Plaintiffs appear to say the contract terms and visa applications

themselves contained fraud because Health Carousel had no intention to follow through on them. This specificity puts Health Carousel on notice of its alleged fraud.

*Health Carousel II*, 2023 WL 5104066, at *10.

In addition to predicate acts based on fraud, Malabanan alleges that CommuniCare engaged in multiple and repeated violations of the TVPA. (Doc. 11, ¶300). Pursuant to 18 U.S.C. § 1590, anyone who "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. *Id.* In *Health Carousel II*, the Court explained that because the phrase "in violation of this chapter" includes TVPA violations, the plaintiffs had adequately pled the predicate act of Trafficking. *Id.*, 2023 WL 5104066, at *11. For the same reasons, Malabanan has adequately pled that CommuniCare engaged in Trafficking. Having concluded that Malabanan's allegations are sufficient to allege more than two predicate acts, including Trafficking and fraud, the undersigned finds no need to reach Malabanan's alternative argument that the alleged multiple TVPA violations, standing alone, constitute a pattern.

### 4. Breach of Contract Claims

In Count 8, Malabanan alleges that CommuniCare breached the August 1, 2022 Letter Contract by failing to pay him for all hours worked, by failing to pay him for shift differentials, and by failing to provide "an *appropriate* orientation program during the first week of employment." (Doc. 11, ¶311-313).

CommuniCare argues that Malabanan's claim fails because the Letter Contract to which Defendant refers did not promise any *number* of working hours, but instead

merely stated an hourly rate would start at $36.00. Nonsense. The Letter Contract clearly specifies that Malabanan would be paid an hourly wage for his work. And Malabanan alleges that he worked extended hours (including but not limited to during meal breaks) for which no wages were paid. (Doc. 11, ¶ 123-139). That is a plausible allegation of a breach of contract.

Malabanan also accuses CommuniCare of failing to immediately assign him work and of failing to provide an "appropriate" orientation during his first week. Once he was required to report to Brookside, he alleges he received an inadequate orientation by licensed practical nurses instead of registered nurses, which did not include orientation on essential policies and procedures. (Doc. 11, ¶¶ 101-102, 112). Citing to its "Orientation" exhibit, CommuniCare contends that it is entitled to dismissal of this claim because the Letter Contract did not guarantee an "appropriate" orientation. But the cited exhibit cannot be considered at this juncture and the undersigned declines to dismiss any of Malabanan's breach of contract claims under Rule 12(b)(6).[14] That said, CommuniCare is free to present the same arguments in any appropriate motion for summary judgment.

### 5. Declaratory Judgment Claim

In Count 10, Malabanan seeks a declaratory judgment that the repayment provision violates the FLSA because if he were forced to comply, that repayment would bring his wages in his last workweek below minimum wage. Under the FLSA, the Department of Labor has issued regulations requiring that minimum wages be paid "free and clear," *i.e.*:

---

[14]While the unsigned and undated Orientation Form may be relevant to the ultimate issue of whether CommuniCare was in breach of the Letter Contract (to the extent that it purports to set out a list of items to be covered during Defendant's orientation), it cannot be considered under Rule 12(b)(6).

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the [FLSA] will not be met where the employee "kicks-back" directly or indirectly to the employer or another person for the employer's benefit the whole or part of the wage delivered to the employee.

29 C.F.R. § 531.35.

CommuniCare argues that since it did not withhold Malabanan's wages from his last paycheck, he lacks standing to sue. "To establish standing, plaintiffs bear the burden of showing (1) a concrete and particularized injury-in-fact which (2) is traceable to the defendant's conduct and (3) can be redressed by a favorable judicial decision." *Dickson v. Direct Energy, LP*, 69 F.4th 338, 343 (6th Cir. 2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130 (1992)). In support, CommuniCare cites to *Bland v. Edward D. Jones & Co., L.P.*, 375 F. Supp.3d 962 (N.D. Ill. 2019). There, a group of former Financial Advisors who worked for the defendants and participated in a Financial Advisor training program challenged a "training cost reimbursement provision" (i.e, a repayment provision) in their employment contracts. The court dismissed, holding that the plaintiffs lacked standing because they had "not alleged any facts suggesting that Defendants have (1) taken any steps to bring litigation against them, (2) ever actually collected money from individuals pursuant to the [repayment] Provision, or (3) even expressly threatened to file suit." *Id*., at 974. The court reasoned that the plaintiffs' alleged fear of being sued was too speculative on the record as alleged:

> There is - at least presently - no concrete harm, and the threat of that harm is too speculative on the facts as Plaintiffs have alleged. In fact, Defendants may never file suit against Plaintiffs for fear that the TCR Provision could be struck down under state law as unconscionable or on other grounds.

*Id.* The *Bland* court alternatively held that the repayment provision in that case was valid under Indiana law.[15]

But *Bland* is easily distinguished. Unlike the plaintiffs there, Malabanan has alleged that CommuniCare has brought and threatened to file baseless lawsuits against several foreign-sponsored registered nurses to induce similarly-situated foreign-sponsored registered nurses to continue working for Plaintiff. He further alleges that as a result of CommuniCare's pattern and practice of filing lawsuits and threatening legal actions, he reasonably believed that he would suffer serious harm if he did not continue working for CommuniCare. (*See* Doc. 11, ¶¶ 189-199). And of course, CommuniCare did in fact file suit against Malabanan to enforce the repayment provision. Therefore, Malabanan has sufficiently asserted a particularized injury, despite receipt of his last paycheck, and has standing to sue for declaratory judgment.

### 6. Unjust Enrichment Claim

In Count 12, Malabanan alleges that CommuniCare has been unjustly enriched based on its failure to pay him for "non-overtime" work he performed during meal breaks. CommuniCare seeks dismissal of this claim based on the overlap with Malabanan's breach of contract claim.[16] "Under Ohio law, a plaintiff may not recover under the theory of unjust enrichment when an express contract covers the same subject." *Bihn v. Fifth Third Mortg. Co.,* 980 F.Supp.2d 892, 904 (S.D. Ohio 2013) (citing *Wuliger v. Mfrs. Life Ins. Co. (USA),* 567 F.3d 787, 799 (6th Cir. 2009)).

---

[15]As previously discussed, Ohio law requires a review of all relevant circumstances in order to determine whether the repayment provision is lawful.

[16]Ironically, CommuniCare's complaint also appears to seek recovery for both breach of contract and for unjust enrichment for the same conduct. (*See* Doc. 2).

The law does provide for exceptions. For example, when the existence of a contract is in dispute, a litigant may seek recovery under alternative legal theories. Another exception exists when there are allegations of fraud, illegality or bad faith, so long as the fraud or bad faith has occurred during the formation of the contract. *TLC Realty 1 LLC v. Belfor USA Group, Inc*., 166 F.Supp.3d 919, 930 (S.D. Ohio 2016); *see also R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n*, 913 F. Supp. 1031, 1043 (N.D.Ohio1996) (citing *Eyerman v. Mary Kay Cosmetics*, 967 F.2d 213, 222 (6th Cir.1992)). But Malabanan has not argued for any exception, instead failing to respond altogether to CommuniCare's argument for dismissal of this claim. Because he has pled breach of an express contract for the same conduct, his claim for unjust enrichment should be dismissed.

## III.  Conclusion and Recommendation

The undersigned emphasizes that in no way is any of the foregoing analysis intended to resolve any issues in this case other than whether Malabanan's allegations survive CommuniCare's Rule 12(b)(6) motion. The plausibility standard is just that – plausibility, not probability. It is entirely possible that once the record is developed, CommuniCare will disprove Malabanan's allegations and be awarded judgment on all remaining claims. But at this preliminary stage of litigation, **IT IS RECOMMENDED THAT** CommuniCare's motion to dismiss all counterclaims (Doc. 13) be **GRANTED** only as to the unjust enrichment claim, and that the motion otherwise be **DENIED.**

 *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

HEALTHCARE FACILITY MANAGEMENT LLC,
d/b/a CommuniCare Family of Companies,                    Case No. 1:23-cv-236

      Plaintiff,                                                       Barrett, J.
      v.                                                               Bowman, M.J.

JEDKREISKY MALABANAN,

      Defendant.


**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

29